**HAMIL AMERICA, INC., Plaintiff–Appellee–Cross–Appellant,**

v.

**GFI, a Division of Goldtex, Inc., Third–Party Defendant–Appellant–Cross–Appellee,**

**SGS Studio, Inc. and J.C. Penney Company, Inc., Defendants–Third–Party Plaintiffs–Appellants–Cross–Appellees.**

**Docket Nos. 98–7573, 98–7615**

United States Court of Appeals,
Second Circuit.

Argued: Dec. 9, 1998
Decided: Sept. 29, 1999

Michael Delikat, New York, N.Y. (John F. Olsen, Orrick, Herrington & Sutcliffe LLP, of counsel), for all Appellants–Cross–Appellees.

Kenneth R. Schachter, New York, N.Y. (Silverberg Stonehill & Goldsmith, P.C., of counsel), for Appellee–Cross–Appellant.

Before OAKES, JACOBS, and POOLER, Circuit Judges.

OAKES, Senior Circuit Judge:

## I. INTRODUCTION

Hamil America, Inc. sued GFI (a Division of Goldtex, Inc.), SGS Studio, Inc. and J.C. Penney Company, Inc. for copyright infringement. According to Hamil America, GFI copied one of Hamil America's floral fabric patterns, SGS manufactured garments using the infringing GFI fabric and sold the garments to J.C. Penney, and J.C. Penney sold the garments in its retail stores. Hamil America prevailed at trial and was awarded damages against all three defendants. GFI, SGS, and J.C. Penney appeal the district court's finding of liability for infringement and its calculation of damages. Hamil America cross-appeals the district court's calculation of damages, arguing that the district court should have awarded damages for profits that Hamil America presumably would have earned had other customers not purchased GFI's infringing pattern. Because the district court erroneously prohibited GFI from deducting any overhead ex-

penses in the calculation of its profits, we reverse in part and remand for recalculation of damages. We affirm on all other issues.

## II. BACKGROUND

Hamil America and GFI are companies doing business in the garment industry. Each sells printed fabric to manufacturers that, in turn, create garments for sale to wholesalers or retailers.

In 1993, Tabitha Kim created an original floral design for Hamil America which was designated Pattern No. 96. Kim transferred her copyright rights in the design to Hamil America. Hamil America produced and sold fabric printed with Pattern No. 96 in various color combinations, or "colorways." One of the color combinations, designated colorway 575, featured clusters of small white and yellow flowers with blue centers on a red background.

SGS is a garment manufacturer. J.C. Penney is a retailer that sells, among other things, garments made by SGS. In June 1994, SGS purchased fabric samples of Hamil America Pattern No. 96 in four colorways, including colorway 575. SGS showed the fabric samples to J.C. Penney, along with other fabric samples obtained from other fabric vendors, to allow J.C. Penney to choose fabric patterns to be used for garments that SGS would manufacture for J.C. Penney. J.C. Penney selected six patterns out of the various patterns shown to it by SGS, including Hamil America Pattern No. 96 in colorway 575 and five GFI patterns.

SGS made sample garments from these six fabric patterns and supplied them to J.C. Penney. J.C. Penney used the sample garments for intra-company marketing and outside advertising. It showed a garment made with Hamil America Pattern No. 96 to buyers in its individual stores and featured a garment made with Hamil America Pattern No. 96 in its newspaper advertising.

SGS then manufactured garments for J.C. Penney. It was more expensive for SGS to use Hamil America fabric than GFI fabric: Hamil America fabric in Pattern No. 96 cost $5 per yard, whereas GFI fabric cost only $3.60 per yard. According to Hamil America, SGS wanted GFI to develop and manufacture a fabric pattern that SGS could substitute for Hamil America Pattern No. 96 in colorway 575, so that SGS could fulfill the J.C. Penney order for garments made from that pattern at a lower cost to SGS.

In October 1994, GFI hired Jae Wang, a freelance artist frequently employed by GFI, to create a fabric pattern that GFI would sell to SGS. In the same month, SGS ordered two yards of Pattern No. 96 in colorway 575 from Hamil America to be shipped to SGS on a rush basis. According to Hamil America, Wang copied, or "knocked-off," Hamil America Pattern No. 96. Wang's design was designated GFI Pattern No. 330.[1] SGS substituted GFI Pattern No. 330 for Hamil America Pattern No. 96 in the garments it manufactured for J.C. Penney.

Hamil America learned of the infringement from Beaver Raymond, one of its Texas manufacturing customers. Raymond asked Howard Goldstein, Hamil America's sales manager, why garments made with Hamil America Pattern No. 96 were being sold at J.C. Penney. Raymond showed Goldstein a garment that Raymond had purchased at J.C. Penney in Dallas, Texas. The garment was made with GFI Pattern No. 330, although Raymond believed that the garment was made with Hamil America Pattern No. 96 because the patterns were so similar. Goldstein then purchased another garment made with GFI Pattern No. 330 at the J.C. Penney store in Dallas.

---

1. Pattern No. 330 was registered with the United States Copyright Office, effective date January 17, 1995.

In April 1995, Hamil America registered Pattern No. 96 with the United States Copyright Office and was granted a registration number, VA 642–546.[2] Hamil America sued GFI for copyright infringement, claiming Hamil America Pattern No. 96 was infringed by GFI Pattern No. 330. Hamil America also sued SGS and J.C. Penney because they each sold garments manufactured with GFI's infringing fabric. After a non-jury trial, the district court found that the defendants willfully infringed Hamil America's copyright. *See Hamil America, Inc. v. SGS Studio, Inc. et al.,* 1998 WL 19991, at *1 (S.D.N.Y. Jan.21, 1998). In March 1998, the court entered judgment in favor of Hamil America against all defendants, and awarded damages in the amount of $201,049 from GFI, $28,836 from SGS, and $67,106 from J.C. Penney.

GFI, SGS, and J.C. Penney appeal the district court's finding of liability for infringement and its calculation of damages. Hamil America cross-appeals the district court's calculation of damages, arguing that the district court should have awarded damages for profits that Hamil America presumably would have earned had other customers not purchased GFI's infringing pattern.

## III. DISCUSSION

### A. *Standard of Review*

■ We review findings of substantial similarity for the purposes of determining copyright infringement *de novo*. *See Folio Impressions, Inc. v. Byer California,* 937 F.2d 759, 766 (2d Cir.1991) ("In considering substantial similarity between two items, we review the district court's findings *de novo* —not on the clearly erroneous standard—because what is required is only a visual comparison of the works, rather than credibility, which we are in as good a position to decide as was the dis-

trict court.") (citing *Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399, 402–03 (2d Cir.1989)).

■ By contrast, we review the district court's determination of willful copyright infringement for clear error, and in doing so give particular deference to determinations regarding witness credibility. *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1382 (2d Cir. 1993) (citing *Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110, 1115 (2d Cir.1986)). "The standard is simply whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded that possibility." *Id.* (citing *Fitzgerald Publ'g,* 807 F.2d at 1115).

■ We review the method of calculation of damages *de novo,* and the actual calculation of damages for clear error. *See Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321, 331–32 (2d Cir. 1998) (citing *Wolff & Munier v. Whiting–Turner Contracting Co.,* 946 F.2d 1003, 1009 (2d Cir.1991); *United States Naval Inst. v. Charter Communications,* 936 F.2d 692, 697–98 (2d Cir.1991)).

### B. *Liability*

Appellants GFI, SGS, and J.C. Penney maintain that the district court incorrectly determined that they infringed Hamil America's copyright. They first argue that Hamil America failed to establish that it owned a valid copyright in Pattern No. 96. They further contend that the district court compared the two patterns under the wrong standard and erred when it found infringement. We address each argument in turn.

---

**2.** As Goldstein testified at trial, Hamil America did not regularly register a copyright as soon as it created a design; instead, it registered its copyrights after it suspected that a design was being infringed. Hamil America has since supplemented its registration to indicate that Tangiers International Ltd. was the author rather than Hamil America.

### 1. *Hamil America's Copyright Registration*

As we stated in *Folio Impressions*, copyright protection extends to fabric designs:

> The right of an author under the common law to have the sole right of first printing and publishing his work was settled early in England by Lord Mansfield writing for the majority in *Millar v. Taylor*, 4 Burrows 2303 (1769). This common law concept was adopted in our Constitution which authorized Congress "[t]o promote the progress of science and useful arts, by securing, for limited times to authors and inventors, the exclusive right to their respective writings and discoveries." U.S. Const. art. I, § 8. The word "writings" is broadly construed; it includes all its forms that may be used to the end that the author's ideas are tangibly expressed.... Among those forms of "writings" now recognized as entitled to copyright protection are fabric designs....

*Folio Impressions*, 937 F.2d at 762 (citing *Millworth Converting Corp. v. Slifka*, 276 F.2d 443 (2d Cir.1960); *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487 (2d Cir.1960)). To establish a copyright infringement cause of action, a plaintiff must show both ownership of a copyright and unauthorized copying by the defendant. *See id.* at 763.

The appellants contend that the district court's finding of liability must be reversed because Hamil America never proved that it owned a valid copyright for the allegedly infringed pattern. They argue that no valid copyright registration statement for Hamil America's Pattern No. 96 had been issued from the copyright office, and no valid certificate was ever entered into evidence.

We disagree. The parties stipulated below that Hamil America registered Pattern No. 96 with the United States Register of Copyrights in April 1995 and that Hamil America received a certificate of registration. A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright, although that presumption of ownership may be rebutted. *See Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir.1992); *Folio Impressions*, 937 F.2d at 763. The party challenging the validity of the copyright has the burden to prove the contrary. *See Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985).

The appellants argued below that there was no valid registration because different companies were variously named as owners of the copyright for Pattern No. 96. As we noted above, Hamil America supplemented its registration after it received the certificate of registration for Pattern No. 96. It first corrected the registration to indicate that the artist who designed the pattern was actually employed by Hamil America's sister company, Hamil Textiles (U.S.A.), Ltd., rather than Hamil America. It later amended the registration to indicate that Tangiers International Ltd. was the author. These amendments to the registration simply clarified the ownership of the copyright in light of the relationships between the relevant companies: Hamil America and Hamil Textiles (U.S.A.) Ltd. were sister companies that shared a design studio; Hamil Textiles merged into Tangiers International; and Hamil America and Tangiers International are both owned by The Algo Group, a Canadian publicly traded corporation. Hamil America's corrections did not invalidate the copyright registration. *See Eckes v. Card Prices Update*, 736 F.2d 859, 861–62 (2d Cir.1984) (stating that "[o]nly the knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of supporting an infringement action") (quoting *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F.Supp. 980, 988 (S.D.N.Y.1980)); *see also* 17 U.S.C. § 408(d) (1996) (stating that information

contained in a supplementary registration, submitted to correct or to amplify the information in an earlier registration, augments but does not supersede the information in the earlier registration).

Moreover, even if Hamil America's recordation was initially inadequate, this alleged shortcoming did not justify dismissal of its copyright action. "[C]ourts have consistently permitted a plaintiff to correct a defective recordation, and to go forward with the suit as of the date of the filing of the action." *Northern Songs, Ltd. v. Distinguished Prods., Inc.,* 581 F.Supp. 638, 641 (S.D.N.Y.1984); *see also Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.,* 690 F.Supp. 298, 302 (S.D.N.Y.1988) (denying defendant's motion for summary judgment that was predicated in part on plaintiff's alleged failure to record transfer of copyright properly). The appellants have not shown that they were prejudiced in any way by Hamil America's alleged failure to obtain a valid copyright. *See Northern Songs, Ltd.,* 581 F.Supp. at 641 (declining to dismiss copyright action on grounds that plaintiff improperly recorded memorandum of transfer of copyright where defendants did not demonstrate that they were prejudiced by plaintiff's alleged errors). The appellants have failed to rebut the presumption that Hamil America validly owned the copyright for Pattern No. 96.

### 2. The Finding of Copyright Infringement

We next consider whether the district court properly found that GFI Pattern No. 330 infringed Hamil America's copyright for Pattern No. 96. "To prove infringement, a plaintiff with a valid copyright must demonstrate that: '(1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's.'" *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1002 (2d Cir.1995) (quoting *Fisher–Price, Inc. v. Well–Made Toy*

*Mfg. Corp.,* 25 F.3d 119, 122–23 (2d Cir. 1994)) (emphasis in original). We address each prong in turn.

#### a. Actual copying

The first part of this test addresses whether the defendant actually copied the work. Actual copying may be shown by direct or indirect evidence; indirect evidence of copying includes proof that the defendants had access to the copyrighted work and similarities that are probative of copying between the works. *See Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997).

Here, there was no question that SGS had access to Hamil America Pattern No. 96, and there was circumstantial evidence that GFI had access to Hamil America Pattern No. 96. The appellants stipulated below that SGS purchased the pattern to show to J.C. Penney. They further acknowledged that Hamil America sent SGS an additional two yards of the pattern in the colorway chosen by J.C. Penney when SGS asked that it do so.

The district court found that the defendants willfully infringed Hamil America's copyright. It determined that the accounts provided by the defendants' witnesses as to the creation of GFI Pattern 330 were not credible. The court relied in particular on the trial testimony of Wang, who denied that he copied Hamil America Pattern No. 96. On cross-examination, however, Wang admitted at trial that he had made "knock-off" designs (i.e., copies of existing designs) in the past. He defined a "knock-off" as the redesign of another design with sufficient changes so that the redesigner does not get sued for copyright infringement. In finding willful infringement, the court relied on Wang's testimony and noted that when Wang "sets out to knock something off, he … tries to put in enough differences that he thinks they will get away with it. They didn't in this case." Moreover, as Hamil America points out, neither Wang nor GFI produced a bill showing Wang billed Pattern No. 330 as an original design, as he had in

the past when making other original designs for GFI. The court also stated that

I am offended by the attempt that your client has made to come up with a phony excuse as to how this pattern was made.... The evidence that your clients have access to [photographs of Hamil America Pattern No. 96] indicate[s] there was not only an opportunity but a need to steal [Hamil America's] design in order to avail a commitment to J.C. Penney.

The court concluded that Hamil America "established not simply by a preponderance of the evidence but by ... clear and convincing evidence that the defendants set out to copy an original design that had been produced by the plaintiff and that had been requested by J.C. Penney."

■ Because the "actual copying" prong of the infringement test requires a fact-intensive inquiry, the district court's determination as to whether the defendant actually copied the plaintiff's copyright material warrants our deference. This is particularly true when the district court must make a credibility determination. *See Twin Peaks Prods.*, 996 F.2d at 1382. The court below was well-situated to gauge the credibility of the witnesses who testified as to whether the appellants willfully copied Hamil America's pattern. In addition, as we discuss below, the many similarities between the patterns are probative of copying. The district court's finding of willful infringement was not clearly erroneous, and the first part of the infringement test was satisfied.

### b. *Substantial similarity*

#### i. *The ordinary observer standard*

■ The second part of the test for infringement addresses whether a substantial ·similarity exists between the two works to be compared. *See Knitwaves*, 71 F.3d at 1002. In most cases, the test for substantial similarity is the "ordinary observer·test," which queries whether an average lay observer would recognize the alleged copy as having been appropriated

from the copyrighted work. *See id.; Folio Impressions*, 937 F.2d at 766. In the words of Judge Learned Hand, the ordinary observer test is whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal· as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960).

■ The appellants maintain that the district court erred when it applied the "ordinary observer" standard in comparing the two patterns at issue in this case. They contend that two artistic renderings of an item found in nature are bound to be similar, and that such designs are protected by only a weak copyright. They urge us to employ a more rigorous standard when we compare the fabric patterns because they depict objects, namely, flowers, that appear in nature. According to the appellants, there can be no finding of infringement unless there is a showing of "near-exact copying" or "striking similarity."

The appellants' argument is grounded in cases such as *First American Artificial Flowers, Inc. v. Joseph Markovits Inc.*, 342 F.Supp. 178 (S.D.N.Y.1972), in which the court compared plastic sculptured reproductions of tea roses. The court asserted that "any two devices purporting to represent a natural prototype or archetype are likely to be similar, quite apart from any copying," and that "a copyright on a work which bears practically a photographic likeness to a natural article, as here, is likely to prove a relatively weak copyright." *Id.* at 186. We similarly observed in *Folio Impressions* that, "though playwrights and poets from William Shakespeare to Gertrude Stein have extolled the beauty of this five-petaled flower, by the rose's very nature one artist's rendering of it will closely resemble ·another artist's work." 937 F.2d at 766. *Cf. Samara Bros., Inc. v. Wal–Mart ·Stores, Inc.*, 165 F.3d 120, 132 (2d Cir.1998) (citing

*Folio Impressions* and stating that the depiction of a "familiar object" enjoys only a narrow copyright).

These considerations notwithstanding, and contrary to the appellants' assertions, the courts in *Folio Impressions* and *First American Artificial Flowers* did in fact apply the ordinary observer standard. *See Folio Impressions*, 937 F.2d at 765–66; *First American Artificial Flowers*, 342 F.Supp. at 186. The appellants argue that we applied a more "discerning" ordinary observer test in *Folio Impressions* because the fabric pattern at issue depicted flowers. They misinterpret our holding in that case. As we discuss below, we applied a "more discerning" test in *Folio Impressions* not because the pattern featured items that appeared in nature, but because the allegedly infringed pattern featured a background that was copied from a design in the public domain. *See Knitwaves*, 71 F.3d at 1003; *Folio Impressions*, 937 F.2d at 765–66. Thus, the fact that the designs at issue in this case portrayed flowers does not preclude the use of the ordinary observer standard.

In any event, it should be noted that the designs of Hamil America Pattern No. 96 and GFI's Pattern No. 330 do not bear "practically a photographic likeness" to real flowers. *First American Artificial Flowers, Inc.*, 342 F.Supp. at 186. Rather, the floral patterns are stylized and not lifelike. Wang, who designed the infringing floral pattern, stated at trial that he "made ... up" the flower. In its findings of fact, the district court stated that "the pattern is not simply the depiction of a flower as it would appear in nature. It is an artistic rendering that has its own unique qualities...."

We conclude that the district court reviewed the two fabric designs under the appropriate "ordinary observer" standard.

ii. *The "more discerning" ordinary observer standard*

■ The appellants contend that we should apply the "more discerning" ordi-

nary observer standard that we enunciated in *Folio Impressions*, 937 F.2d at 765–66. This test is applied when a work contains both protectible and unprotectible elements, and requires the court to eliminate the unprotectible elements from its consideration and to ask whether the protectible elements, standing alone, are substantially similar. *See Knitwaves*, 71 F.3d at 1002; *Folio Impressions*, 937 F.2d at 765–66. For example, in *Folio Impressions*, we considered the alleged copying of a fabric design that consisted of stylized roses arranged on a complex background. Testimony at trial revealed that the pattern's designer had copied the background from a document which was in the public domain, and "contributed nothing, not even a trivial variation" to the design. *Folio Impressions*, 937 F.2d at 764. Since the background design lacked originality, it was not copyrightable, and consequently the copyright extended only to the roses which were superimposed on top of the background, and to the arrangement of those roses. *See id.* at 763–65; *see also Knitwaves*, 71 F.3d at 1003. Having narrowed the scope of the copyright, we applied a "more discerning" ordinary observer test and compared only the protected portion of the design—that is, the roses and the way they were arranged, rather than their display against the background—to the allegedly infringing fabric design. *Folio Impressions*, 937 F.2d at 765–66; *see also Knitwaves*, 71 F.3d at 1003.

As we have subsequently cautioned, *Folio Impressions* featured "rather specialized facts" and provides no authority for the broad proposition that "in comparing designs for copyright infringement, we are required to dissect them into their separate components, and compare only those elements which are in themselves copyrightable." *Knitwaves, Inc.*, 71 F.3d at 1003; *see also Mastercraft Fabrics Corp. v. Dickson Elberton Mills Inc.*, 821 F.Supp. 1503, 1512 (M.D.Ga.1993) (describing the "more discerning" test in *Folio*

*Impressions* as predicated on the fact that "the entire background design of the fabric came from a public domain source"). Here, there is no contention that either party imported unprotectible material from the public domain into its floral fabric design. We therefore need not apply the "more discerning" ordinary observer standard.

### iii. *Liability*

 Application of the ordinary observer standard requires us to scrutinize the two patterns for substantial similarity: would an average lay observer recognize GFI Pattern No. 330 as having been appropriated from Hamil America's Pattern No. 96? *See Knitwaves, Inc.*, 71 F.3d at 1002. In comparing works for infringement purposes, we examine the works' "total concept and feel." *Id.* at 1003 (citing *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 (2d Cir.1982)). When discussing how to apply the ordinary observer standard, we have endorsed the notion that, "[g]ood eyes and common sense may be as useful as deep study of reported and unreported cases, which themselves are tied to highly particularized facts." *Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc.*, 490 F.2d 1092, 1093 (2d Cir.1974) (quoting *Couleur Int'l Ltd. v. Opulent Fabrics Inc.*, 330 F.Supp. 152, 153 (1971)). And, as noted above, we review the district court's finding of substantial similarity *de novo*, because "what is required is only a visual comparison of the works, rather than credibility, which we are in as good a position to decide as was the district court." *Folio Impressions*, 937 F.2d at 766.

Viewed under the ordinary observer standard, it is clear to us that GFI's Pattern No. 330 and Hamil America's Pattern No. 96 are substantially similar. Both patterns depict small clusters of flowers and leaves. The shapes of the flower petals and the leaves are virtually identical, and feature similar defining line work and highlights in the flowers and leaves. Both patterns depict leaves that do not appear to be attached to any of the flowers. Both patterns are "tossed," which means that they have no top or bottom and are non-directional, and appear in repeat.

The intended uses of both fabric patterns further support a finding of substantial similarity. As we stated in *Soptra Fabrics*, a district court comparing two textile designs must give "due weight to 'the uses for which the design is intended, especially the scrutiny that observers will give to it *as used.*'" 490 F.2d at 1093–94 (alteration in original) (quoting *Peter Pan Fabrics*, 274 F.2d at 489). The fabric designs at issue in *Soptra Fabrics* "were to be used in dresses, and although small differences between the designs might be found to exist under courtroom scrutiny, those differences fade away within a few feet or absent sharp scrutiny." *Id.* at 1094. Likewise, Hamil America Pattern No. 96 and GFI Pattern No. 330 were to be used in garments, and the slight differences between the two patterns fade away when they are viewed from a distance. Giving due weight, as we must, to the scrutiny that observers would give to the patterns *as used*, we conclude that the patterns are substantially similar. This conclusion is substantiated by the fact that when Raymond saw the garment made with GFI Pattern No. 330, he immediately assumed that it was made with Hamil America Pattern No. 96.

The similarities become even more obvious when we compare Hamil America Pattern No. 96 in colorway 575 with the GFI fabric that was used in the garments for J.C. Penney. Both fabrics use the exact same colors in the same manner, featuring small yellow and white clusters of flowers with blue centers on a red ground, surrounded by similarly shaped olive green leaves with dark green shading. As we stated in *Soptra Fabrics*, "[t]he appearance in one of defendant's fabrics of colors identical to plaintiff's is additional evidence of actual copying, as well as another factor leading to the conclusion that the aesthetic

{}

appeal of the fabrics is the same...." *Soptra Fabrics Corp.*, 490 F.2d at 1094 (quoting *Couleur Int'l*, 330 F.Supp. at 154). We note, however, that the copyright for Pattern No. 96 is for the design itself, and is not limited to a specific color arrangement. Thus, the fact that Hamil America did not make all of the colorways used by GFI for Pattern No. 330 does not limit the scope of GFI's infringement.[3] The similarity of design in the two patterns is such that we see an identity of design when we look at the patterns in the various colorways available in the record.[4]

When we compared the "total concept and feel" of two items in *Knitwaves, Inc.*, we focused on the original way the author " 'selected, coordinated and arranged' the elements of his or her work." *Id.* at 1004 (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). Here, GFI has duplicated Hamil America's selection of clustered flowers and leaves, its coordination of these elements in particular spatial combinations, and its arrangement of these design elements on a tossed pattern that appears in repeat. Given the similarity of the "total concept and feel" of the fabric patterns, we are not convinced by the appellants' recitation of differences. *See Knitwaves, Inc.*, 71 F.3d at 1003 (citing *Eden Toys*, 675 F.2d at 500); *see also Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 517 F.Supp. 900, 902–03 (S.D.N.Y.1981) (holding that fabric design was copied where ordinary observer of garments made with the two fabrics at issue who was not searching for differences would have concluded that fabrics

were same design, despite slight changes in detail).

Because GFI Pattern No. 330 is substantially similar to Hamil America Pattern No. 96, we affirm the district court's holding that the appellants infringed Hamil America's copyright.

### C. *Damages*

We next turn to the issue of damages. Under the current Copyright Act, a copyright owner can elect to recover either "actual damages and profits" under 17 U.S.C. § 504(b), or "statutory damages" under 17 U.S.C. § 504(c). 17 U.S.C. § 504(c)(1). At Hamil America's request, the district court awarded damages under 17 U.S.C. § 504(b). *See Hamil America, Inc.*, 1998 WL 19991, at *1. Hamil America could recover "the actual damages suffered by [it] as a result of the infringement, *and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.*" 17 U.S.C. § 504(b) (emphasis added). These two methods of recovery available under § 504(b) serve two distinct purposes: "[d]amages are awarded to compensate the copyright owner for losses from the infringement, and profits are awarded to prevent the infringer from unfairly benefitting from a wrongful act." H.R.Rep. No. 94–1476, at 161 (1976), reprinted in 17 U.S.C.A. § 504 at 146 (West 1996).

The parties contend that the district court erred with respect to both damages calculations permitted under § 504(b). The appellants argue that the court erred

---

**3.** But it is worth noting that when we compare the various colorways for Hamil America's pattern and GFI's pattern that are reproduced in the record, we observe that other colorways feature similar color combinations.

**4.** The district court reached the same conclusion. It observed that while the similarity is most obvious when comparing the two colorways with a red background, the similarity occurs in the "other colorways" that it had examined:

[T]he pattern is not simply the depiction of a flower as it would appear in nature. It is an artistic rendering that has its own unique qualities and those qualities are what the defendants set out to copy and did, in fact, copy. You see it in the spacing, the number of flowers used, the way the leaves are presented, leaves not attached to the flowers at all but floating in the spaces between flowers, the fact that often the flowers are presented next to a depiction of buds.

by disallowing deductions for overhead and other fixed expenses from the profits generated from the sales of the infringing fabric. Hamil America cross-appeals the calculation of its own actual damages, arguing that it was entitled to recover profits that it presumably would have earned had other customers not purchased GFI's infringing pattern. We address each issue in turn.

### 1. *Calculation of the Infringers' Profits*

Section 504(b) of the Copyright Act authorizes a copyright owner to recover the infringer's profits. That section expressly provides that "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Put another way, the infringer's profits are calculated as the gross sales of infringing goods minus the costs that the infringer proves are attributable to the production and sale of those goods.

■■■ In compliance with this statutory procedure, Hamil America submitted proof of GFI's gross revenue from the sale of the infringing dress patterns, and GFI submitted a schedule of its deductible expenses that included both the actual costs of production of the infringing pattern as well as its general, or "fixed," overhead expenses. The district court rejected GFI's submission to the extent that it sought deductions for overhead expenses, stating that GFI "would have had general administrative expenses of 'X' amount whether [it] sold [the infringing] goods or not." The court also rejected certain specific expenses, such as country club dues, on the ground that they were not "incremental costs of producing [the infringing] fabric." The court asked GFI to adduce the "actual cost of the goods, what it actually cost [GFI] to manufacture [the] specific items." The

district court accepted GFI's amended cost schedule, which showed only the variable costs of producing and selling the infringing pattern, and which excluded general overhead items such as rent, insurance, and depreciation. *See Hamil America, Inc.*, 1998 WL 19991, at *3.

GFI argues that the district court erred in excluding an allocation of general overhead expenses in its calculation of GFI's profits and that we must remand for recalculation of damages. We agree.

Our analysis begins with *Sheldon v. Metro–Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir.1939) (L.Hand, *J.*), in which a motion picture studio infringed the copyright on a certain play. The district court allowed a deduction for overhead expenses based on the ratio that the cost of producing the infringing movie bore to the total costs of the movie studio. *See id.* at 54. On appeal, the copyright holder argued that the infringers should not have been permitted any deduction for overhead expenses absent a showing that the overhead had been increased by the production of the infringing movie, which was only one of forty produced by the studio. *See id.* This court affirmed, noting generally that, " '[o]verhead' which does not assist in the production of the infringement should not be credited to the infringer; that which does, should be; it is a question of fact in all cases." *Id.*

Turning to the specific facts of the *Sheldon* case, the court applied its general rule as follows:

> In the case at bar the infringing picture was one of over forty made by the defendants, using the same supervising staff and organization, which had to be maintained if the business was to go on at all. Without them no picture could have been produced; they were as much a condition upon the production of the infringing picture as the scenery, or the plaintiffs' play itself.

*Id.* The court thus concluded that certain categories of general overhead expenses—

in this case, those relating to creating and maintaining a "supervising staff and organization"—were appropriately deducted from gross revenue. The court then considered various methods of allocating those overhead expenses to the production of the infringing movie, and selected the method that was most fair, accurate, and practical in light of the infringing company's structure and products. Given the impossibility of determining the overhead costs that were directly related to the production of the infringing motion picture, the court permitted a deduction of a portion of overhead expenses based on the cost of production of the motion picture:

> [T]o make a perfect allocation one would have to examine what part of the time of all the employees whose pay went into the "overhead", was given to each picture; and so of the other expenses. That was obviously impossible. It is on the whole more likely that a given picture required that proportion of the general services represented by its cost of production, than that each picture shared those services equally.... The [cost of production] solution appears to us as nearly right as was practically possible.

*Id.* at 52–53.

The court therefore affirmed the district court's use of an estimate of overhead expenses based on the cost of production—notwithstanding the absence of particularized findings as to the use of those expenses for things that specifically contributed to the infringing picture—because of the "extravagant labor" necessary to determine the incremental contribution of individual property to the infringing picture:

> It was better ... to compute this item by assuming that the infringing picture used that proportion of the whole plant which its cost of production bore to the cost of production of all pictures made that year, than to attempt any allocation of buildings and other property accord-

ing to their actual use for the picture. The second method would have been incredibly difficult in application, involving as it would a different proportional use of each bit of property concerned. *Id.* at 54. In adopting this pragmatic approach, the court implicitly rejected the need for a detailed analysis of an infringer's ledgers.

■ *Sheldon* thus contemplates a two-step procedure for deducting overhead expenses from an infringer's profits. The first step is to determine what overhead expense categories (such as rent, business, entertainment, personnel and public relations) are actually implicated by the production of the infringing product. Once a sufficient nexus is shown between a category of overhead and the production or sale of the infringing product, a court need not scrutinize for inclusion or exclusion particular items within the overhead category. For example, if "entertainment expenses" is a category of overhead implicated in the line of business that produced or sold the infringing product, then country club dues included within that category should not be singled out for exclusion, as they were by the district court here. Rather, the court should limit its inquiry to the sufficiency of the nexus between the expense category and production of the infringing product.

■ The second step is to arrive at a fair, accurate, and practical method of allocating the implicated overhead to the infringement. The infringer has the burden of "offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue." 4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 14.03[B], at 14–39 (1996); *see also In Design v. K–Mart Apparel Corp.,* 13 F.3d 559, 565–66 (2d Cir. 1994). The reasonableness of the proffered overhead allocation formula is a question of fact in all cases. *See Sheldon,* 106 F.2d at 54.[5]

---

5. Some methods of allocating overhead to the infringement proffered in previous cases in-

*Sheldon*'s approach has been consistently applied by this Court. In subsequent cases, we have assumed that general overhead expenses were deductible and reviewed only the sufficiency of the nexus between the expense and the infringing product and/or the adequacy of the adduced formula for allocating overhead costs to the production of the infringing product. *In Design*, for example, concerned a copyright holder's challenge to the district court's conclusion that certain overhead expenses (including rent, advertising, payroll, shipping, and store supplies) were deductible from gross profits. *See In Design*, 13 F.3d at 565–66. Applying the *Sheldon* rule, we affirmed and held that overhead expenses were appropriately deducted because such expenses are generally deductible, because the expenses were sufficiently related to the sale of the infringing product, and because the allocation formula offered by the infringer was reasonable. *See id.* at 566.

In another case, we rejected an infringer's allocation of company overhead, which was based on the percentage of the company's net sales to the infringing line of goods, on the ground that the proffered allocation was not the most reliable method available to the infringer. *See Manhattan Indus. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 7–8 (2d Cir.1989). We reasoned that although an infringer "need not prove its overhead expenses and their relationship to the production of the contemptuous goods in 'minute detail,' it must still carry its burden of demonstrating a *sufficient nexus* between each expense claimed and the sales of the unlawful goods." *Id.* (emphasis added) (quoting *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir.1985)). *See also Gaste v. Kaiserman*, 863 F.2d 1061, 1071 (2d Cir.1988) (rejecting a 90 percent allocation of overhead to an infringing song that represented 90 percent of the infringer's sales); *Wilkie v. Santly Bros.*, 139 F.2d 264, 265 (2d Cir.1943) (holding that general allocation formula should allocate overhead equally to each song produced by the infringer because there was no evidence that the infringing song contributed more to the overhead costs than the publisher's other 47 songs).

Despite the clear precedent on the deduction of overhead expenses established by *Sheldon* and its progeny, the district court here prohibited GFI from deducting any overhead whatsoever unless GFI could show that its overhead was actually increased by its production of Pattern No. 330. *See Hamil America, Inc.*, 1998 WL 19991, at *3 ("[T]he Court must examine the facts to determine those incremental cost[s] of the infringer that were increased as a direct result of the production and sale of the infringing goods ... and to separate them from those fixed costs that would have been incurred in any event."). The court appears to have based its holding at least in part on the fact that the infringement by GFI was willful, relying on cases from other jurisdictions suggesting that willful or deliberate infringers may not deduct overhead when calculating the profit the plaintiff is entitled to recover. *See id.* at *1 (citing *Jarvis v. A & M Records*, 827 F.Supp. 282, 294 (D.N.J. 1993)). *See also Saxon v. Blann*, 968 F.2d 676, 681 (8th Cir.1992); *Frank Music Corp.*, 772 F.2d at 515.

Unlike the district court, we are not prepared to abandon the teachings of *Sheldon* in favor of a hard and fast rule denying all overhead deductions to willful infringers. But we share the district court's concern that willful infringers should not be permitted to subsidize the sale of legitimate goods with the sale of infringing goods by "passing part of its fixed cost on

clude: the production cost of the infringing product as a percentage of the total production costs, *see Sheldon*, 106 F.2d at 52–52; the number of infringing products as a percentage of total products, *see Wilkie v. Santly* Bros., 139 F.2d 264, 265 (2d Cir.1943); and the dollar sales from the infringing product as a percentage of total dollar sales, *but see Gaste v. Kaiserman*, 863 F.2d 1061, 1071 (2d Cir.1988) (rejecting the dollar sales method).

to the copyright holder." *See id.* at *2. We also recognize that "a rule of liability which merely takes away profits from an infringement would offer little discouragement to infringers." *F.W. Woolworth Co. v. Contemporary Arts,* 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952). We therefore conclude that *Sheldon* 's two-step approach must be applied with particular rigor in the case of willful infringement.

■ Every infringer shoulders the burden of demonstrating a "sufficient nexus between each expense claimed and the sales of the unlawful goods," *Manhattan Indus.,* 885 F.2d at 8, before it may deduct any overhead expenses from its profits. When infringement is found to be willful, the district court should give extra scrutiny to the categories of overhead expenses claimed by the infringer to insure that each category is directly and validly connected to the sale and production of the infringing product. Unless a strong nexus is established, the court should not permit a deduction for the overhead category. *See Kamar Int'l Inc. v. Russ Berrie & Co.,* 752 F.2d 1326, 1332 (9th Cir.1984) (allowing overhead deduction "only when the infringer can demonstrate it was of actual assistance in the production, distribution or sale of the infringing product." (citing *Sheldon* )).

An infringer also bears the burden of proposing a fair and acceptable formula for allocating a portion of overhead expenses to the infringing items at issue. *See In Design,* 13 F.3d at 565–66. The district court must determine that the particular allocation formula is optimal and sound, and all presumptions are drawn against the infringer. *See id.* at 564 ("Any doubts resulting from an infringer's failure to present adequate proof of its costs are resolved in favor of the copyright holder.") (citing *Gaste,* 863 F.2d at 1070–71); *see also Nimmer on Copyright,* § 14.03[B], at 14–40 ("[If] the computation of profits and costs is uncertain due to the failure of the [infringer] to keep adequate records of costs, any doubt in the evidence will be resolved in favor of the plaintiff."). The allocation formula of a willful infringer should be held to a particularly high standard of fairness, and the court should not hesitate to reject a formula which allows the willful infringer to deduct more of its overhead than was directly implicated in the manufacture of the infringing product.

Because the district court erred under *Sheldon* in applying a blanket prohibition of all overhead deductions, we reverse on this issue and remand for a recalculation of GFI's profits. In that proceeding, GFI, as a willful infringer, must demonstrate a direct and valid nexus between each claimed overhead expense category and the production of GFI Pattern No. 330 and propose a fair and acceptable formula for allocating a portion of overhead to the pattern's production. The district court, applying the heightened scrutiny appropriate in cases of willful infringement, will have the latitude to adopt or reject certain categories of overhead, and to accept, reject, or amend GFI's overhead allocation formula. Of course, if the resulting calculation causes the district court to reconsider its finding that Hamil America "will be fully compensated on its claims," *see Hamil America, Inc.,* 1998 WL 19991, at *3, the court could award Hamil America its "actual damages" in lieu of, or in addition to, GFI's recalculated profits. *See* 17 U.S.C. § 504(b).

### 2. *Hamil America's Lost Profits*

■ Hamil America raises one issue on cross-appeal: whether the district court erred when it determined that Hamil America could not recover for lost profits that it might have earned from sales to those of its customers who purchased GFI's infringing design. It relies on three facts: (1) Hamil America and GFI had several shared customers; (2) the shared customers bought samples of Hamil America Pattern No. 96 with the probable intention to purchase more Hamil America fabric; and (3) the shared customers did not purchase the fabric from Hamil America

after the less expensive version offered by GFI appeared on the market. Hamil America reasons that it is entitled to damages for lost profits, as it would have sold Pattern No. 96 to the shared customers had GFI not made the infringing pattern. It argues that it is entitled to a total judgment against GFI in the amount of $240,782, rather than the $201,049 that was awarded by the district court.

GFI argued below that Hamil America should not recover lost profits, because the shared customers would not have purchased the fabric at Hamil America's above-market prices. GFI also pointed out that those customers purchased GFI's fabric several months after they had purchased Hamil America's samples, and concluded that the commercial failure of Hamil America's pattern "had nothing to do with the availability of [GFI's] pattern."

■■■ The district court agreed that the shared customers may well have declined to purchase Hamil America's fabric, due to its higher price, and held that Hamil America could not recover the alleged lost profits. See Hamil America, Inc., 1998 WL 19991, at *3.[6] The court further noted that Hamil America could not recover both for its hypothetical sales to the shared customers and for GFI's actual sales to those same customers.[7] See id. The court elected to measure GFI's actual profits from sales to the shared customers, rather than speculate as to what Hamil

America might have earned had it sold Pattern No. 96 to the shared customers. See id. ("[I]n these circumstances, it appears more accurate to measure plaintiff's lost profit on these [alleged sales to the shared customers] by looking to the incremental profit that defendant actually realized on its sales to these accounts.").

■■■ As Nimmer states, "[i]n the absence of convincing evidence as to the volume of sales that plaintiff would have obtained but for the infringement, the measure of lost profits may be rejected as too speculative." Nimmer on Copyright § 14.02[A], at 14–11 (citing Odegard, Inc. v. Costikyan Classic Carpets, Inc., 963 F.Supp. 1328, 1341 (S.D.N.Y.1997)). The district court rejected Hamil America's request for lost profits as too speculative. In our view, this conclusion was not clearly erroneous. See also Odegard, Inc., 963 F.Supp. at 1340 ("When seeking an award of damages for lost sales, the burden is on the plaintiff to demonstrate that it would have made the sales but for the infringing activity."). In the absence of more reliable evidence of Hamil America's lost profits, the district court was entitled to rely on the less abstract calculation of damages from GFI's sales to the shared customers. We therefore affirm on this issue.

## IV. CONCLUSION

Because the district court erroneously prohibited GFI from deducting any over-

---

6. In so deciding, the district court may have also relied upon the testimony of Hamil America's sales manager, who conceded that not every customer who sampled Hamil America's patterns ultimately placed a larger production order.

7. Hamil America properly conceded below that "it may not recover its profit on these alleged sale[s] and defendant[s]' profit on the sale to these companies." Hamil America, Inc., 1998 WL 19991, at *3. A copyright plaintiff may recover its own lost profits, which are part of the plaintiff's "actual damages," as well as the defendant's profits. But a "plaintiff may not recover damages that have already been taken into account in computing its actual damages." Nimmer on Copyright, § 14.03, at 14–29. Thus, "[a] plaintiff may

not recover its full lost profits plus all of the defendant's profits, for this would constitute a forbidden double recovery." Id. § 14.02[A], at 14–10 (citing Taylor v. Meirick, 712 F.2d 1112 (7th Cir.1983)). Thus, if Hamil America were in fact entitled to recover lost profits, it would have had to set off its recovery for GFI's profits by those profits already taken into account to determine Hamil America's lost profits, because Hamil America could not recover twice. Hamil America properly performed this analysis below, when Hamil America contended that it had lost profits of $149,823, and that GFI's profits not taken in account in computing Hamil America's lost profits were $90,959, for a total judgment against GFI in the amount of $240,782.

head expenses in the calculation of its profits, we reverse in part and remand for recalculation of damages. We affirm on all other issues.