Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 6, 2003       Decided June 20, 2003

No. 02-7003

LESLIE ATKINS, D/B/A LESLIE ATKINS COMMUNICATIONS,
APPELLANT

v.

BENSON J. FISCHER, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 98cv00800)

———

*C. Joel Van Over* argued the cause for appellant. With him on the briefs was *David J. Butler*. *Edward A. Pennington* entered an appearance.

*Richard E. Schimel* argued the cause for appellee. With him on the brief was *Michael J. Budow*. *Stanley H. Goldschmidt* entered an appearance.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: EDWARDS, SENTELLE and HENDERSON, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* Sentelle.

SENTELLE, *Circuit Judge*: Appellant Atkins brought this action against defendant-appellees alleging copyright infringement in the commercial use of six-pack carrier and bottle designs for a product called "Redneck Beer," along with a claim for violation of the Lanham Act. The district court granted summary judgment in favor of appellees. Because we find that there are substantial issues of material fact, we vacate the judgments in favor of defendants, and remand for further proceedings.

## I

Appellant Atkins is the sole proprietor of Leslie Atkins Communications, an advertising, marketing, and public relations firm. Atkins offers services aimed at developing brand identities for products in various businesses. Appellee Fischer is President of the Fischer Organization, Inc., a real estate firm. In 1990 or 1991, he originated the concept of a product called "Redneck Beer." Fischer contacted several brewing companies in an effort to find a means of producing and marketing his proposed product. He was unsuccessful at first.

Fischer then decided that he would attend a beer convention in Las Vegas in hopes of finding a joint venture partner or a manufacturing partner with whom he could arrange to produce and market Redneck Beer. Fischer contacted several graphic artists in hopes of obtaining rough preliminary sketches or drawings of a potential packaging design for Redneck Beer to use as a sales tool at the convention.

Fischer ultimately entered into an agreement with Atkins by which Atkins would create designs for Redneck Beer. The parties executed two formal agreements, a "Project Order Agreement" and a "Terms & Conditions Agreement" on September 8, 1993. Under the terms of the Project Order Agreement, Fischer and Atkins agreed to two stages of work:

stage one involved the production of two color illustrations or paintings, one of a bottle of Redneck Beer and one of a six-pack carrier, with an artist's rendering of logo labels; stage two involved final logo development and production of camera-ready art. The fees for the two stages of work were $2000 and $4500, respectively. Both parties understood that neither party was obligated to proceed with the second stage of the agreement. The Terms and Conditions Agreement contained the following provision: "Ownership and possession of all underlying creative work developed and supplied by Leslie Atkins Communications shall remain the exclusive property of Leslie Atkins Communications; creative work includes, but is not limited to, sketches, copy, photographs, illustrations, type, and mechanical art boards." Atkins testified at deposition that she believed that this provision allowed her to retain her rights to her creative work and to set a price for use of that creative work. Atkins also testified that she charged Fischer less than she otherwise would have, with the understanding that she would be able to obtain royalties for the use of her work.

Following the execution of the agreements, Atkins subcontracted with a graphic artist, Tom Gaadt, to prepare initial sketches of possible Redneck Beer designs. Under Atkins' direction, Gaadt produced several preliminary sketches bearing "hillbilly or country-themed design elements suggestive of the beer's Redneck name." *Atkins v. Fischer*, Civ. No. 98–0800, slip op. at 4 (D.D.C. Nov. 30, 2001). Atkins showed these sketches to Fischer, and Fischer selected a design featuring a red bandana at the bottle's neck and a body label of a blue jeans pocket with a red bandana hanging from the pocket. Gaadt produced new illustrations of the selected design. On September 28, 1993, shortly before Fischer left for the Las Vegas convention, Atkins delivered the new illustrations to Fischer. On the date of delivery, appellant sent a note to appellees that stated "I'm glad we're finally going to design a look for Red Neck Beer."

After returning from the convention, Fischer requested that Atkins make some modifications to the design, including the addition of some colors and a "tab label" on the blue jean

pocket with "Fischer" printed on it. Atkins had these modifications made and delivered the revised illustrations to Fischer on October 3, 1993. Fischer paid Atkins in full for the first phase of the contract.

The second phase of the contract was never reached because Fischer declared that he was unhappy with Atkins' designs. In January of 1995, appellee Fischer Brewing Company was incorporated in Washington, DC. By March of 1995, appellees had engaged a number of different advertising firms to work on designs for the Redneck Beer bottle label and six-pack carrier. On March 31, 1995, appellees entered into a manufacturing services agreement with the Stroh Brewing Company. A provision in the agreement with Stroh required Fischer Brewing to warrant that it was the exclusive owner or licensee of all trademarks and copyrights which it would use and authorize Stroh to use in manufacturing and marketing the product. On advice from counsel, Fischer sought execution of a work-for-hire agreement by Atkins. Atkins refused to sign the agreement. On April 3, 1995, Atkins filed a copyright registration for her designs.

By August of 1995, Fischer and Fischer Brewing Company had registered the name "Redneck" with the U.S. Patent and Trademark Office and had begun selling and distributing Redneck Beer. They marketed Redneck Beer with labels and containers bearing designs by Art Advertising, Inc. that were marked by a label and placed in six-pack carriers featuring a design of a blue jeans pocket and a red bandana.

In March of 1998, Atkins filed a complaint against appellees, alleging copyright infringement and false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Appellees filed an answer that included several affirmative defenses. Over two years later and after the close of discovery, in December of 2000, appellees moved to amend their answer and assert an additional defense—implied license. The district court granted the motion and reopened discovery. Atkins thereafter filed a motion for summary judgment.

On November 30, 2001, the district court denied Atkins' motion for summary judgment and *sua sponte* granted summary judgment for appellees. The court concluded that appellees had an implied nonexclusive license to use Atkins' work in the commercial production of Redneck Beer. The court also held that the six-pack carrier design appellees actually used was not substantially similar to Atkins' designs. In addition, the court, without explanation, dismissed Atkins' Lanham Act claim. Atkins appealed, arguing, among other things, that the district court erred in holding that appellees had an implied license to use Atkins' work in the commercial production of Redneck Beer; that the district court erred in concluding that the six-pack carrier design used by appellees was substantially similar to Atkins' six-pack carrier design; and that the district court erred in dismissing the Lanham Act claim.

## II

### A. Implied License

Section 204 of the Copyright Act invalidates attempted transfers of copyright ownership made without a writing. 17 U.S.C. § 204(a) (2000). However, section 101 of the Act excludes nonexclusive licenses from the definition of "transfer of copyright ownership." 17 U.S.C. § 101. A nonexclusive license may be granted orally or arise from the conduct of the parties. *Nelson–Salabes, Inc. v. Morningside Development, LLC*, 284 F.3d 505, 514 (4th Cir. 2002); *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998); *Lulirama Ltd., Inc. v. Axcess Broad. Serv.*, 128 F.3d 872, 879 (5th Cir. 1997); *IAE, Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990). Such an implied license will arise where "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Lulirama*, 128 F.3d at 879 (quoting *IAE*, 74 F.3d at 776). Because the existence of an implied license is an affirmative defense to infringe-

ment, the alleged infringers have the burden of establishing an implied license. *IAE*, 74 F.3d at 775.

The only disputed issue in this phase of the case is whether Atkins intended Fischer to copy and distribute her work. Atkins acknowledges that she delivered her designs to Fischer before the Las Vegas beer convention with the intent that Fischer would use her designs as a sales tool at the convention, but she argues that Fischer's actions in marketing the product thereafter exceed the scope of his license to use the designs. *MacLean Assoc. v. Wm. M. Mercer–Meidinger–Hansen, Inc.*, 952 F.2d 769, 779 (3d Cir. 1991) ("[T]he licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license."). Atkins argues that she did not intend for Fischer to use her designs as anything more than a sales tool at the convention and that, at a minimum, a genuine issue of material fact exists with regard to the intent of the parties. Appellees argue that they hold an implied license to use the artwork from the first stage of the agreement in completing the second stage because the designs from the first stage were indisputably intended to be used in the second stage. Appellees further argue that the note from Atkins to Fischer on the date of delivery of the first-stage designs supports their theory that the parties intended the first-stage designs to be used by Fischer in the commercial production of Redneck Beer.

We review these grants of summary judgment "*de novo*, affirming only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Republican National Committee v. Taylor*, 299 F.3d 887, 890 (D.C. Cir. 2002). The record before us presents a genuine issue of fact on the material issue of the intent of the parties. As the district court recognized, the two-stage written agreement between the parties sheds little light on whether completion of the first stage of the agreement implied a grant of a nonexclusive license to use Atkins' copyrighted designs for commercial production or merely as a sales tool at the convention. *Atkins v. Fischer*, Civ. No. 98–0800, slip op. at 22 (D.D.C. Nov. 30, 2001) (noting that the agreement between the parties "does not eliminate the possi-

bility of an oral or implied grant of a nonexclusive license"). The existence of the second stage of the agreement suggests that the parties contemplated that the designs, created during the first stage, would be used in the second stage to create camera-ready art suitable for commercial production. Nevertheless, there is a genuine issue as to whether the agreement implies the grant of a nonexclusive license to Fischer to use the bottle and six-pack carrier designs from the first-stage for subsequent commercial production without Atkins' cooperation and further compensation. This is especially so considering the relatively small price Fischer paid for completion of the first stage of the agreement. Arguably, Atkins' acceptance of the relatively small payment of $2000 for the use of her copyright designs supports a finding that the intent of the parties was that only a limited license be conveyed. This factor distinguishes the present case from *Effects*, 908 F.2d 555, upon which the district court relied in concluding that Atkins had granted Fischer an implied license to use her designs for commercial production. In *Effects*, the Ninth Circuit placed significant weight on the fact that the licensee paid almost $56,000 for seven shots of special effects footage for a movie, explaining that holding that the licensor did not convey to the licensee a license to use the footage in the movie "can't be squared with the . . . almost $56,000 [paid] for this footage." *Id*. at 559. The $2,000 in the present case, nothing else appearing, will not support the same sort of reasoning.

The parties' conduct similarly fails to illuminate this issue. Certainly, Atkins' delivery of her designs to Fischer just before the Las Vegas beer convention is consistent with an intent that Fischer would use them as a sales tool at the convention, but does not conclusively establish whether Atkins intended for appellees to use them further in the commercial production of Redneck Beer without additional compensation. Likewise, the statement in Atkins' note delivered to Fischer on the date of the delivery of the first-stage designs ("I'm glad we're finally going to design a look for Red Neck Beer") leaves the issue open to argument. That the parties were "finally going to design a look for Red Neck

Beer" does not indicate one way or another whether this "look" would be used simply as a sales tool or in commercial production. Moreover, the statement suggests that the "look" to which Atkins refers is not the product of the first stage of the agreement because the statement indicates that the "look" to which she refers is something that the parties are "going to design" in the future. Thus, a genuine issue of material fact exists as to the question of intent, rendering summary judgment inappropriate.

In addition, Atkins testified that Fischer told her several times that "[t]here would be plenty of money later on" and that Fischer talked her into reducing her prices for her work because of his assurances that she would "make a lot of money on this." Such statements are appropriate evidence in determining whether an implied nonexclusive license arises from the conduct of the parties, *Foad Consulting Grp. v. Azzalino*, 270 F.3d 821, 833–34 (9th Cir. 2001) (Kozinski, J., concurring), and further expose the genuine issue of material fact that requires jury deliberation. Therefore, summary judgment was inappropriate and the implied license issue should have been submitted to trial.

B.   Substantial Similarity

The Copyright Act defines derivative works as those "based upon" the copyrighted work. 17 U.S.C. § 101. Courts interpret the Act to mandate that derivative work that is "substantially similar" to the original work upon which it is based is an infringement. *E.g., Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002). Because substantial similarity is an extremely close question of fact, summary judgment has traditionally been frowned upon. *Id.* at 1296. The question is whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Hamil America, Inc. v. GFI*, 193 F.3d 92, 100 (2d Cir. 1999). Judge Learned Hand previously described the test as whether the ordinary observer, "unless he set out to detect the disparities, would be disposed to over look them, and regard their aesthetic appeal as the same."

*Id.* (quotation omitted). When determining similarity, courts are to look at the "total concept and feel" of the designs. *Id.* at 102. When comparing the designs, it is not sufficient to dissect separate components and dissimilarities. The original way that the author "selected, coordinated, and arranged the elements" of her work is the focus of the court. *Id.* at 103. Although all derivative works have differences from the original, it is the similarities, rather than the differences, that inform whether the "total concept and feel" of the works and their "aesthetic appeal" is the same. *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1004 (2d Cir. 1995).

In ruling against Atkins, the court found that Atkins' six-pack carrier design and the challenged six-pack carrier design "merely reflect a similar idea or concept and are not sufficiently substantial to raise a genuine issue of material fact with regard to copying." *Atkins v. Fischer*, Civ. No. 98–0800, slip op. at 31 (D.D.C. Nov. 30, 2001). While we cannot say that the district court was wrong in its conclusion, it is not apparent that the record before the court was sufficient to have decided as a matter of law rather than submitting to a trier of fact the determination of substantial similarity of the total concept necessary to the resolution of this issue.

The Second Circuit in *Knitwaves*, 71 F.3d 996, provides a working example of the adjudication of this sort of copyright infringement case. In that case, Knitwaves filed an action against Lollytogs, alleging infringement of Knitwaves' copyrighted sweater designs. Despite numerous differences cited by Lollytogs, the court found that the two sweater designs had the same "total concept and feel." For example, Lollytogs had pointed out that its "leaf" sweater used a five-leaf design of leaf and acorn appliques made of felt with two pairs of leaves above and one leaf below, whereas Knitwaves used an eight-leaf design of leaf appliques made of puffy polar fleece and placed in three rows. In addition, the leaves were arranged in different patterns. 71 F.3d at 1004. The Second Circuit explained that despite the differences "in detail" "requiring considerable ink to describe," the differences "do little to lessen a viewer's overwhelming impression that the

. . . Lollytogs sweaters are appropriations of the Knitwaves sweaters." *Id.*

In the present case, Atkins maintains that the court focused too much on the differences in detail and too little on the similarity in concept and feel:

> In the Atkins Design, the words "Redneck Beer" appear sprawled across a jean's pocket and the red bandana which hangs out of the pocket. In contrast, on the actual carrier, the words "Redneck Beer" appear in a different style of writing, are differently colored and are written directly across the jeans pocket. Further, there is no bandana hanging out of the jeans pocket depicted on the label. While the red bandana does appear on the actual carrier, it appears only on the top of the carrier, with the white patterned detailing seemingly enlarged in comparison to the bandana on the Atkins carrier. The actual carrier features different writing, located in different places from that on the Atkins carrier. Lastly, the actual carrier does not include any of the "suds" detailing which appears on the Atkins carrier. In sum, the only similarity between the two carriers is the fact that they both feature blue-jeans material, a red bandana, and the word "Redneck."

*Atkins v. Fischer*, Civ. No. 98–0800, slip op. at 31 (D.D.C. Nov. 30, 2001) (internal citations omitted).

Atkins argues that a reasonable jury could find that the differences in detail between the two designs do not lessen the total concept and feel of similarity between the designs. *E.g., Sturdza*, 281 F.3d at 1297 (reversing finding of noninfringement where court overlooked similar expression of design concepts and the "overall look and feel" of the two designs); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 827 (9th Cir. 2002) (the presence of some similarities and differences made the question unfit for summary judgment and better left for the jury). We agree. Upon *de novo* review of the record, while we are not prepared to say that the district court's conclusion of dissimilarity was incorrect, that is not the test. This issue of substantial similarity in a copyright

infringement case "is customarily an extremely close question of fact," as to which "summary judgment has traditionally been frowned upon." *Sturdza*, 281 F.3d at 1296 (citations omitted). Such a grant of summary judgment would be appropriate only "if the works are so dissimilar as to protectable elements that no reasonable jury could find for the plaintiff on the question of substantial similarity." *Id.* at 1297. In conducting our *de novo* review under that correct standard, we conclude that a reasonable jury could have found for appellant on this issue, and we therefore must order vacatur of the summary judgment.

## C. Lanham Act

The district court did not explain why it dismissed Atkins' Lanham Act claim. Accordingly, we cannot determine the effect our reversal of summary judgment on the copyright infringement claims has upon the Lanham Act claim. We therefore remand that claim to the district court so it may reconsider the claim in light of our decisions on the copyright infringement claims.

## III

The presence of material factual issues renders summary judgment inappropriate for both the implied license issue and the issue of substantial similarity between the six-pack carriers. Accordingly, we reverse the grant of summary judgment. We also vacate and remand the court's dismissal of Atkins' Lanham Act claim to allow the court an opportunity to reconsider that claim in light of our decision on the implied license and substantial similarity issues.

*So ordered.*