NATIONAL ASSOCIATION FOR
STOCK CAR AUTO RACING,
INC. (NASCAR) Plaintiff,

v.

Matthew T. SCHARLE,
et al., Defendants.

No. Civ.A.04–5228.

United States District Court,
E.D. Pennsylvania.

Feb. 11, 2005.

Camille M. Miller, Cozen & O'Connor, P.C., Philadelphia, PA, Roderick J. Enns, Enns & Archer LLP, Winston–Salem, NC, for Plaintiff.

Matthew I. Cohen, Jeffrey S. Edwards, Dechert L.L.P., Philadelphia, PA, for Defendants.

### MEMORANDUM & ORDER

KATZ, District Judge.

█ Plaintiff National Association for Stock Car Auto Racing, Inc. ("NASCAR") brings this action seeking a declaratory judgment that it owns the worldwide copyrights in and to the championship hardware known as the NASCAR NEXTEL Cup Series Trophy. Named as Defendants are the Franklin Mint (the "Mint"), the company enlisted to design the trophy, Bruce Newman,[1] the Mint's former President, and Matthew Scharle, an independent contractor hired by the Mint to work on the trophy project. Scharle, who alleges that he is the sole designer of and, therefore, the copyright holder in and to the trophy, filed a counter-claim as well as a cross-claim against Newman. For its part, the Mint filed a cross-claim against Scharle and a subsequent motion for summary judgment on that claim.[2] It is this

---

1. NASCAR subsequently dismissed its claims against Newman without prejudice.

2. Scharle incorporated a motion to dismiss the Mint's cross-claim into his response to the Mint's summary judgment motion. Therein, he argues that the Mint's claim for a declaratory judgment is non-justiciable because it is not ripe for adjudication. This court disagrees. Scharle himself, through counsel, initiated the dispute by writing to NASCAR, claiming that he was the designer of the trophy and making demands for compensation and publicity. In fact, he even threatened to take legal to seek to enjoin NASCAR's public awarding of the trophy, an action that led to the racing association's filing of this suit. Al-

though Scharle later agreed not to interfere with the trophy presentation, he still claims that he is the rightful owner of the copyrights in and to the trophy. Likewise, the Mint contends that Scharle transferred to it any copyrights he may have had, and that it in turn transferred those rights to NASCAR. Based on these facts, the Mint's claim for a declaratory judgment against Scharle presents an actual, live controversy that is ripe for adjudication by this court. The parties' interests are adverse, this court's decision is sufficiently conclusive to define their respective legal rights, and it provides practical utility in that it will effectively end the dispute between the parties. *NE Hub Partners, L.P. v. CNG*

motion that is presently before the court. Because there exists no genuine issue of material fact that NASCAR alone holds the copyrights in and to the trophy, this court will grant the Mint's motion for summary judgment.

## I. BACKGROUND

In 2004, NASCAR unveiled a playoff-style championship in its premiere circuit, the NEXTEL Cup Series, in an effort to create an exciting, post-season atmosphere for its drivers and fans. The novel format, named "Chase for the NASCAR NEXTEL Cup" after its new sponsor, features a ten race shootout among the regular season's top ten drivers. As such, the 2004 season ushered in a new era for the racing association. Not only did it mark the end of the use of the traditional, season-long, points race that NASCAR had previously employed to determine its champion, but it also saw the sport part ways with the R.J. Reynolds Tobacco Company, which had sponsored the premiere circuit—then known as the Winston Cup Series—for the previous thirty-three years.

To capitalize on these prospective changes, NASCAR began planning in 2002 for the design of a new championship trophy that, according to the racing association, would both symbolize the contemporary positioning of its new sponsor and capture the excitement of the widely anticipated playoff format. To that end, Plaintiff contacted Newman, who was then President of the Mint, and asked him whether the Mint would be interested in submitting a proposal to design the trophy. Believing that such a proposal would be beneficial to the existing licensing relationship between the Mint and NASCAR, Newman agreed. He assumed the position as head of the design team and served as NASCAR's only day-to-day contact with the Mint.

Newman's initial efforts on the design produced two creative briefs that set forth alternate models of the trophy. He presented both to NASCAR executives at a meeting in Charlotte, North Carolina in the fall of 2002. Although the executives asked him to focus on developing the second brief, known as Brief B, Newman—based both on feedback he received at the meeting and on subsequent conversations with NASCAR's decision-makers—believed that neither design was perfectly responsive to the racing association's desire to create a simple, elegant trophy. As a result, he developed a new brief, known as Brief B2, which included his own sketches of his vision for the design. Newman contends that it was these sketches that provided the foundation for what ultimately became the NASCAR NEXTEL Cup Series Trophy.

After changing the name of the original Brief B to Brief B1, Newman consolidated Briefs B1 and B2 and presented them to Donna Tarquino, an art director of the Mint's studio, with instructions to use the briefs to develop alternate models for the trophy design. As an art director, Tarquino was responsible for coordinating and supervising each design team. Her duties on the trophy project included doling out the various assignments required to meet Newman's requests to the Mint employees and independent contractors on the NASCAR team. One of those independent contractors was Scharle, a design artist and former Mint employee, who had been laid off in July of 2002 as part of a general down-sizing initiative.

Immediately after his termination, Scharle signed the Special 2–D Master

*Transmission Corp.,* 239 F.3d 333, 342 (3d Cir.2001) (citing *Step–Saver Data Sys., Inc. v.* *Wyse Tech.,* 912 F.2d 643, 647 (3d Cir.1990)).

Agreement ("Master Agreement"), a standard contract used by the Mint to retain as independent contractors artist employees whom it had laid off in the down-sizing. Scharle understood that his signing the Master Agreement was a precondition to his receiving any work from the Mint.[3] At the same time he signed the Master Agreement, Sharle also executed an additional contract setting forth his hourly rate of compensation for all the work that he expected to perform pursuant to the Master Agreement.

The Master Agreement, in a section entitled "Title to Work and to Copyright," contains the following language: "The Artist ... agrees to sell to Franklin and Franklin agrees to purchase from the Artist, all the right, title and interest, and all worldwide copyright rights, in and to certain works of art to be executed by the Artist as an independent contractor in accordance with this Agreement ... The Artist shall create such works of art only as authorized by Franklin on riders to this Agreement. The applicable Rider shall set forth any other terms and conditions pertaining specifically to a Work of Art which are in addition to those set forth herein. Compensation for a Work of Art shall be as mutually agreed by Franklin and Artist and documented on the applicable Rider. Exclusive worldwide rights to reproduce the Works of Art in any form ... are also included in the purchase price." Master Agreement at 1.

During the course of his work as an independent contractor, Scharle's primary contact at the Mint was Tarquino, who always assigned him work by either telephone or email. Despite the Master Agreement's reference to written riders, it was the Mint's standard practice to convey assignments to its independent contractors—many of whom were former Mint employees familiar with both the Mint's procedures and current employees—in this informal manner. Scharle Dep. at 96. In fact, Scharle neither requested nor signed a rider for any of the approximately 25 jobs he performed for the Mint after his official termination. *Id.* at 95.

In accordance with these procedures, Tarquino telephoned Scharle in October of 2002 to ask him if he would be interested in providing technical drawings for the design of what was to eventually become the new NASCAR trophy. Scharle agreed and subsequently began working on two-dimensional, computer drawings for the trophy design. Throughout the coming months, Scharle would submit his original drawings and designs to Tarquino, often making adjustments and re-submitting them after receiving her feedback. Scharle invoiced the Mint based on his hourly rate for his work, and the Mint paid all such invoices in full.

Shortly after Newman's meeting in Charlotte, the Mint again presented NASCAR with the alternate trophy designs at a meeting in Miami, Florida. Included in the presentation were drawings rendered by Scharle. Satisfied with both designs, NASCAR subsequently contacted Newman to inquire into whether the Mint would be willing to complete them and

---

**3.** Scharle testified as follows at his deposition:

Q. Was it your understanding that [the Master Agreement] was what enabled you then to receive these additional projects from the Mint?
A. Yes. This was the only way I could receive any projects from the Franklin Mint.

Q. Did the Franklin Mint represent to you [that] if [you did] not sign [the Master Agreement] that you would not be given any work from the Franklin Mint?
A. Yes.
Q. So then you had to sign this in order to get that work?
A. Yes.
Scharle Dep. at 94, 133.

then manufacture two trophies. The racing association envisioned that B1 would become the trophy for the NASCAR Craftsman Truck Series, while B2 would eventually be presented to the winner of the NASCAR NEXTEL Cup Series. Newman agreed on behalf of the Mint, and although negotiations broke down shortly thereafter with respect to the NEXTEL Cup trophy, the parties eventually met again and agreed in principle in the fall of 2003 that the Mint would produce that trophy in time for it to be unveiled in 2004.

Before Newman and his team began work on the actual production of the trophy, the Mint and NASCAR began negotiating the terms of a contract known as the Independent Franklin Mint Agreement ("IFMA"), a contract that would set forth the parties' rights and obligations with respect to the trophy designs. In particular, the IFMA provides that all services rendered by the Mint, including all Trophy designs, are "works made for hire" as defined in the U.S. Copyright Act and that such works shall remain "the sole and exclusive property of NASCAR." IFMA at ¶ 2. The agreement also provides that if for any reason the works are held not to be works made for hire, then the Mint agrees to sell, transfer, or assign to NASCAR "all rights in and to the works, including without limitation, the worldwide copyright in and to the works once reduced to tangible form." *Id.*

By December 2003, with its work on the trophy design near completion, the Mint determined that a continuing licensing relationship with NASCAR was no longer critical to its success and decided to cease work on the trophy project. As such, the Mint asked NASCAR not to execute the already negotiated IFMA. Despite the Mint's decision to end its licensing relationship with NASCAR, the racing association wanted Newman to see the project through to its completion and asked him to stay on and finish the work on the trophy. Newman agreed to do so and stepped down as the Mint's President on the final day of 2003.

Newman and NASCAR formalized an agreement for the former's continued work on the trophy project by negotiating and executing the Independent Services Agreement ("ISA"). The ISA contains the same "works made for hire" and copyright transfer provisions as the IFMA, as well as a pledge by NASCAR to use reasonable efforts to acknowledge Newman as the trophy's designer under appropriate circumstances.[4] ISA at ¶¶ 6–7. In March of 2004, Newman met with Tiffany, the company selected by NASCAR to manufacture the trophy, to discuss two-dimensional art and issues relating to the trophy production. He continued to communicate with the NASCAR team at Tiffany during the following months, helping to adapt the design to facilitate the manufacturing of the final product.

In September of that same year, NASCAR publicly unveiled the trophy as the symbol of the Chase for the NASCAR NEXTEL Cup. Two months later, it awarded the new hardware track-side at the conclusion of the racing season to the first NEXTEL Cup champion, Kurt Busch. Scharle claims that the trophy, which features a checkered flag design, was manufactured based on his original drawings and that, therefore, he—and not Newman—is its sole author.

---

4. Both the IFMA and the ISA were executed by the relevant parties in March of 2004. No party has disputed that both of these contracts are valid and have effectively transferred any copyrights in and to the trophy originally owned by Newman and the Mint to NASCAR. This court agrees.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather, it determines whether or not there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. *Id.* at 256, 106 S.Ct. 2505.

The moving party has the burden of showing there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 639 (3d Cir.1996). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989). Rather, there must be evidence on which a jury could reasonably find for the nonmovant. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. Section 204(a)

■ Scharle's claim for copyright infringement—and for a declaratory judgment that he owns the copyrights in and to the trophy—rests upon the premise that, despite signing the Master Agreement, he did not transfer his ownership of the copyright to any other party. In support of this premise, he advances two arguments. First, Scharle contends that he could not have transferred his rights to the trophy as a matter of law because the Master Agreement did not satisfy the Copyright Act's requirements for written transfers. In the alternative, he argues that even if the Master Agreement were legally capable of effectuating such a transfer, his work on the NASCAR trophy was not covered by that agreement. This court, however, is not persuaded by either argument. Not only did the Master Agreement conform to the Copyright Act's requirements for written transfers, but it also governed Scharle's work for the Mint on the trophy design.

Under the Copyright Act, a transfer of ownership "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Despite the clear mandate that a valid transfer of copyright ownership be in writing, the Act does not spell out the requirements of such a writing, and the Third Circuit has yet to address the issue. While a handful of courts have arrived at various tests in attempting to accomplish this task, this court finds the opinion of the Ninth Circuit in *Effects Assocs., Inc. v. Cohen* the most instructive in so doing. 908 F.2d 555 (9th Cir.1990).

In *Effects Assocs.*, the court explained that the writing requirement set forth in Section 204(a) "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price." 908 F.2d at 557 (citation omitted). In light of these purposes, the court concluded that the writing requirement is not "unduly burdensome" but instead is "really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Carta; a one-line pro forma statement will do." *Id.*

Other courts have agreed that the writing requirement is a rather lax one. *E.g., Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir.1999) ("No magic words must be included in a document to satisfy § 204(a). Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright.") (citations omitted). *Foraste v. Brown Univ.*, 290 F.Supp.2d 234, 240 (D.R.I.2003) (finding that, although the Ninth Circuit's approach is not universally accepted, the requirement that the transfer instrument be "clear" is frequently supported in other Section 204(a) decisions); *Bieg v. Hovnanian Enters., Inc.*, 157 F.Supp.2d 475, 480 (E.D.Pa.2001) (adopting the logic of *Effects Assocs.* and explaining that even though the word "copyright" need not be mentioned in a valid transfer instrument, the terms of any such instrument—even a one-line pro forma statement—must nevertheless be clear) (citation and quotations omitted).

On the other hand, at least one court has interpreted the writing requirement as a bit more rigorous. *Pamfiloff v. Giant Records, Inc.*, 794 F.Supp. 933, 936 (N.D.Cal.1992) (likening Section 204(a) to the statute of frauds and, therefore, finding that a valid transfer instrument must· (1) reasonably identify the subject matter of the agreement, (2) be sufficient to indicate that the parties have reached an agreement, and (3) state the essential terms of the agreement with reasonable certainty); *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 864 F.Supp. 246, 250 (D.Mass.1994) (conducting analysis pursuant to the *Pamfiloff* statute of frauds test within the context of a motion for a preliminary injunction but not explicitly adopting that test).

In the instant case, it is plain that the Master Agreement is the written embodiment of the parties' mutual understanding that, in exchange for monetary compensation, Scharle would transfer the copyright in any work he performed on an independent contractor basis to the Mint. Thus, it passes the *Effects Assocs.* test. As the express language of the contract provides, "The Artist ... agrees to sell to Franklin and Franklin agrees to purchase from the Artist, all the right, title and interest, and all worldwide copyright rights, in and to certain works of art to be executed by the Artist as an independent contractor in accordance with this Agreement ... Exclusive worldwide rights to reproduce the Works of Art in any form ... are also included in the purchase price." Master Agreement at 1. This language could not be more clear in demonstrating the parties' intent: Scharle would be paid for his work, and the Mint would retain the copyrights. Indeed, at the time he executed the Master Agreement, Scharle signed another contract setting forth his hourly compensation rate, and it is undisputed that he invoiced the Mint—and was paid in full—for all of the work he performed as an independent contractor.

■ Scharle nevertheless contends that the Master Agreement is legally deficient and, therefore, incapable of effectuating a written transfer of copyright under Section 204(a). In support of this proposition he cites the *Pamfiloff* line of cases, which hold that valid transfer instruments must identify the subject matter of the agreement. 794 F.Supp. at 936. As such, Scharle argues that because the Master Agreement does not specifically mention the trophy, it is an invalid transfer instrument under Section 204(a). This argument, however, is unconvincing.

Even if this court were to adopt the *Pamfiloff* approach and require that the transfer instrument identify the trophy, it would still reject Scharle's argument because the Master Agreement does just that: it applies to works of art created by the artist as an independent contractor in accordance with its terms. That it identifies the trophy design as part of a larger group of works as opposed to specifically mentioning the project by name is irrelevant. In fact, such contracts are commonplace in the art and entertainment industries. *E.g., Mellencamp v. Riva Music Ltd.,* 698 F.Supp. 1154, 1155 (S.D.N.Y. 1988) (referencing a written publishing agreement in which singer transferred worldwide copyrights in and to all works to be composed during the term of the agreement).

The reasoning behind the *Pamfiloff* court's requiring that the subject matter be identified is to ensure that the parties understand precisely what they are bargaining for. Here, that underlying rationale is satisfied because Scharle testified at his deposition that he understood that his agreeing to the terms set forth in the Master Agreement was a necessary precondition to his receiving any work from the Mint on an independent contractor basis. Furthermore, the contract meets the second and third prongs of the statute of frauds test because it is sufficient to indicate that the parties have reached an agreement, and it states the essential terms of that agreement with reasonable certainty. The fact that the dollar figures for Scharle's compensation are set forth in a companion contract does not defeat this conclusion. As such, this court finds that the Master Agreement is a legally sufficient transfer instrument under Section 204(a).

■ Scharle next contends that even if the Master Agreement were a valid transfer instrument under Section 204(a), it could not have effectuated a transfer of his copyrights in and to the trophy design because it did not cover any of his work on the NASCAR project. In support of this argument, Scharle maintains that the Master Agreement only applied to works that were (1) authorized by the Mint on riders to the contract itself and (2) done exclusively for the Mint. The court, however, finds that the rider provision was modified by the parties and that Scharle's work on the trophy design was indeed done exclusively for the Mint. As such, it must reject Scharle's argument and conclude that there is no genuine issue of material fact that Master Agreement is controlling in this case.

The Master Agreement provides that, "The Artist shall create such Works of Art only as authorized by Franklin on Riders to this Agreement." Master Agreement at 1. It goes on to explain that such riders shall set forth compensation for a project, as well as any specific terms and conditions not set forth in the Master Agreement. *Id.* Plainly, the purpose of the rider requirement is to ensure that artists do not undertake any work other than that commissioned by the Mint and then attempt to charge the Mint for that unneeded or unwanted work. Likewise, the purpose of requiring a rider that sets forth

specific terms and compensation is to provide the parties with a clear understanding of the parameters of each individual project, which can vary from artist to artist and project to project. Here, both of these purposes are satisfied. As Scharle's deposition testimony explains, Tarquino contacted him to ask if he wanted to work on the NASCAR project. Thus, Scharle's work was done at the request of the Mint. In addition, he signed a contract setting forth his compensation at the time he signed the Master Agreement, and he had ongoing telephone and email contact with Tarquino, who provided him with a clear understanding of the project.

 Nevertheless, Scharle argues that the absence of a written rider commissioning his work defeats application of the entire Master Agreement. The court disagrees because it finds that the parties orally modified that agreement to eliminate the rider requirement. It is well settled under Pennsylvania law[5] that the parties may subsequently modify a written agreement, either by words or conduct. *First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir.1987) (citing state cases); *In re Labrum & Doak*, 2000 WL 1204646, at *7 (E.D.Pa.2000) (proof of oral modification of written contract does not require clear and convincing evidence but instead evidence that is no greater than necessary to prove any oral agreement) (citations omitted). Because the Mint assigned all of his approximately 25 projects to him by email or telephone, and because Scharle—with the admitted understanding that he would not receive any work unless he signed the Master Agreement—accepted and was compensated for those projects despite the absence of a written rider, this court finds sufficient evidence to conclude that the parties modified the terms of their contract.

 Scharle's final argument is that his work on the trophy design was beyond the scope of—and, therefore, not covered by—the Master Agreement because that contract only applies to works done "exclusively" for the Mint. He seems to suggest that the Mint's commissioning the work on behalf of NASCAR somehow defeats a finding of exclusivity. This court disagrees. The Mint contracted with NASCAR to design a trophy, and it subcontracted some of that design work out to Scharle, who was aware at all times that his work would be submitted by the Mint to NASCAR. Scharle did indeed render his drawings exclusively for the Mint, as there is no evidence that he used them for any other purpose or submitted them to any other company. The mere fact that the Mint submitted works to NASCAR that it commissioned for that very purpose does not destroy the exclusive relationship entered into by the Mint and Scharle.

## C. Implied License

 Even if this court had concluded that the Master Agreement were legally deficient or that it did not cover Scharle's design work, it would still grant the Mint's summary judgment motion because there is no genuine issue of material fact that Scharle granted an implied license to use his drawings for the purposes of creating the NASCAR trophy.

 Although the Copyright Act does not permit the exclusive transfer of copyright ownership absent a writing, a court may find that a nonexclusive license has been implied by either the conduct of, or an oral agreement between, the parties involved. *Atkins v. Fischer*, 331 F.3d 988,

---

5. The Master Agreement provides that it shall be "subject to and construed in accordance with the laws of the Commonwealth of Pennsylvania." Master Agreement at 4.

991 (D.C.Cir.2003) ("A nonexclusive license may be granted orally or arise from the conduct of the parties."); *MacLean Assocs. v. Wm. M. Mercer–Meidinger–Hansen, Inc.,* 952 F.2d 769, 779 (3d Cir.1991) ("[A] nonexclusive license may be granted orally, or may even be implied from conduct.") (citation and quotations omitted). Courts have held that an implied license arises where the following three elements are met: (1) the licensee requests the creation of a work; (2) the licensor creates the work and delivers it to the licensee; and (3) the licensor intends that the licensee copy and distribute the work. *Atkins,* 331 F.3d at 991–92 (citation and quotations omitted); *Nelson–Salabes, Inc. v. Morningside Dev., LLC,* 284 F.3d 505, 514 (4th Cir.2002) (citing *Effects Assocs.,* 908 F.2d at 558–59).

Based on the undisputed facts in this case, this court concludes that Scharle granted a non-exclusive implied license to the Mint to use his drawings in order to design the championship trophy for NASCAR. First, the Mint as licensee requested that Scharle create the works in question. Answer and Counterclaim of Defendant Scharle at ¶ 48 ("In October of 2002, after being laid off and as an independent contractor, Scharle began to create the artwork used to create the Trophy at the request of the Mint."). Second, it is clear that Scharle as licensor created and delivered the requested works to the Mint. *Id.* at ¶ 51 ("Scharle delivered his original drawings and designs of the Trophy to the Mint on July 16, 2003.").

Third and finally, there can be no dispute that Scharle knew and intended that the Mint would copy and distribute his work for use in the manufacturing of the NASCAR trophy. *Id.* at ¶¶ 48, 50 ("The sole direction to Scharle from the Mint was to design a new Trophy for NASCAR ... At various times, Scharle submitted versions of the artwork ultimately use [sic]

to create the Trophy to [sic] the Mint."). Scharle's deposition testimony confirms this fact. Scharle Dep. at 31, 122 ("[Tarquino] contacted me and said ... we want you to do it. We want you to submit designs for the cup ... To my understanding it was NASCAR ... [F]rom what I understood, the Franklin Mint was given the opportunity to submit designs and to manufacture the trophy."). In fact, when asked whether all of the work he did on the trophy was pointed towards creating designs that ultimately would be translated by someone else into a physical, three-dimensional object, Scharle answered in the affirmative, explaining that his drawings were a means to an end, or, in his own words, "the guidelines, the blueprints, the aesthetic design of the product." *Id.* at 130–31. Furthermore, in email exchanges between Scharle and Tarquino, the former asked such questions as whatever happened to his "Winston Cup designs" and whether "Bruce [Newman] showed the design I did with the cup," unequivocally evidencing his knowledge that Newman was distributing copies of his drawings to NASCAR's then-sponsor Winston. Thus, there is no genuine issue that all three elements are met and that Scharle, therefore, granted the Mint a nonexclusive implied license to use his drawings to help create the NASCAR trophy.

■ Although he does not dispute the facts that support a finding of an implied license, Scharle advances various arguments that this court cannot find the existence of such a license as a matter of law. First, Scharle contends that even if he granted an implied license to the Mint, he could not have granted it to NASCAR because he had no direct dealings with the racing association itself. Scharle bases this argument on the premise that in every case in which a court has found the existence of an implied license, there has been

evidence of direct contact between the licensor and licensee. Such a premise, however, is unfounded. This court can find no case that injects a privity requirement into the implied license doctrine, and it declines to be the first to do so.

In *Effects Assocs.*, low-budget horror movie mogul Larry Cohen commissioned Effects Associates to create special effects for an upcoming film, entitled "The Stuff," which was to be distributed by New World Entertainment. 908 F.2d at 555. Unhappy with the plaintiff special effects company's efforts, Cohen paid less than the agreed upon price for the effects but nevertheless incorporated them into the movie. *Id.* at 556. Effects Associates then sued Cohen for copyright infringement because he distributed his film through New World without first obtaining a written license or assignment of the copyright. *Id.* at 555. Despite the absence of a writing, the Ninth Circuit invoked the implied license doctrine and found for Cohen, holding that "Effects impliedly granted nonexclusive licenses to Cohen and his production company to incorporate special effects footage into 'The Stuff *and to New World Entertainment to distribute the film.*'" *Id.* at 559 (emphasis added). The court arrived at the conclusion that Effects granted an implied license to New World absent any evidence of direct interaction between those two companies. Thus, *Effects Assocs.* makes clear that the lack of privity in this case between Scharle and NASCAR does not defeat this court's finding of an implied license.

■ Second, Scharle argues that even if he granted an implied license to the Mint, that license was not transferable to NASCAR because such is the nature of implied licenses. In support of this proposition, Scharle cites *In re Buildnet, Inc.*, in which the court explained that "a nonexclusive license is personal to the transferee and cannot be assigned without the con-

sent of the licensor." 2002 WL 31103235, at *5 (Bkrtcy.M.D.N.C.2002) (citations omitted). *Buildnet*, however, was outside the context of an implied license, and its logic does not extend to the doctrine at issue here. The third element of the implied license test provides that the licensor intends that the licensee copy *and distribute* his work. *Atkins*, 331 F.3d at 992 (emphasis added) (citations and quotations omitted). Here, there is no dispute that Scharle knew and intended that the Mint, through Newman, would distribute copies of his work to NASCAR or its sponsors for the purpose of the ultimate manufacturing of the trophy. Thus, there was no need for the Mint to transfer its implied license to NASCAR. The racing association obtained its own implied license because all involved parties contemplated from the outset that any work commissioned by the Mint pertaining to the trophy design would be delivered to, and used by, NASCAR.

■ Third and finally, Scharle argues that even if he did grant an implied license to use his designs, NASCAR exceeded the scope of that license because he never intended that the racing association would actually use the trophy or credit Newman as its designer. This argument, however, fails both because there is no dispute that Scharle's actions manifested his intent that NASCAR would use his designs in constructing the trophy, and because his wishes with respect to whether Newman would receive credit for the design are irrelevant.

■ The granting of a nonexclusive implied license precludes an action for copyright infringement unless the licensee's use exceeds the license's scope, which is governed by the parties' intent. *Atkins*, 331 F.3d at 992 (citation and quotations omitted). In attempting to determine the scope of an implied license, a court must make an objective inquiry into the facts

that manifest the parties' intent, as opposed to a subjective inquiry into the mind of the licensor. *John G. Danielson, Inc. v. Winchester–Conant Props., Inc.*, 322 F.3d 26, 42 (1st Cir.2003) (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 777 (7th Cir.1996)).

Here, as discussed *supra*, there is no dispute that Scharle intended that the Mint would deliver his designs to NASCAR to be used as blueprints for the manufacturing of the trophy. Scharle's pleadings and deposition testimony, in addition to his email exchange with Tarquino, clearly and unambiguously manifest such intent. In fact, not only did Scharle know and intend that NASCAR would so use his designs, but he also understood that he would not receive any public credit or be attributed as the trophy designer. Scharle Dep. at 113 ("I asked [Tarquino] if . . . there is any way I could be [attributed as being the designer] along with [the Mint] . . . [a]nd her response was, 'You know how the Franklin Mint works; they will just take your design and maybe they will take a piece of somebody else's and a piece of somebody else's and put it together and that's theirs, not yours.' ").

■ Furthermore, Scharle's claim that he never intended that Newman be credited with the trophy design is irrelevant to this court's analysis. In *Shaver*, a joint venture group formed to construct an airport cargo hangar building subcontracted with an architect named Shaver to prepare schematic drawings for the first phase of the building design. 74 F.3d at 770. The group eventually employed another architect who drew upon Shaver's drawings to construct the building, but Shaver claimed that such actions exceeded the scope of any implied license to use his work because of his belief that he was granting the license under the condition that he would be the architect to complete the project. *Id.* at 778.

Although the Seventh Circuit rejected Shaver's argument based on the fact that the record contained written authorization for the use of his drawings, it likely would have done so even absent a writing. As the First Circuit explained in applying *Shaver* to determine the existence of an implied license, "If an architect worked on a short-term assignment with no outward signs of expecting to continue involvement with the larger project, and handed over the requested plans to a client without a contract or other limitations, it would not matter if he or she harbored private hopes of working on the next phase of the project." *John G. Danielson, Inc.*, 322 F.3d at 42 (citing *Shaver*, 74 F.3d at 777). Likewise, in the instant case, Scharle handed his work to the Mint without limitation and with the knowledge that it would be used as the blueprint for the new NASCAR trophy. His unarticulated, private hopes are irrelevant and do not defeat this court's finding that he granted an implied license.

## D. Visual Artist Rights Act

■ In addition to his claims for copyright infringement and a declaratory judgment, Scharle brings a claim for breach of the rights of attribution and integrity granted by the Visual Artist Rights Act ("VARA"), 17 U.S.C. § 106A. Because Scharle's drawings fall outside the purview of the works of art protected by the VARA, this court must grant the Mint's motion for summary judgment on this claim.

Passed by Congress in 1990 to bring this country more in line with others in protecting certain "moral" rights of artists, the VARA, among other things, allows artists to claim authorship in certain works of art. Congress, however, recognized the problems inherent in expanding VARA protection too broadly, and it, therefore,

went to extreme lengths to narrowly define the works of art to be covered by the act. H.R. Rep. 101–514, 101st Cong., 2d Sess. 11 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6921. As such, it decided that the VARA would protect only "works of visual art," as defined by the Copyright Act, which include: (1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or (2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author. 17 U.S.C. § 101.

Because Scharle's drawings are not "works of visual art" as defined by the Copyright Act, they are not protected by the VARA. The works do not exist in a single copy or a limited quantity of signed and numbered copies but instead as multiple attempts to arrive at the optimal design for the trophy. Scharle submitted many versions of his computer designs at various times, often emailing them to Tarquino, who would print them out, show them to Newman, and subsequently relay feedback to Scharle so that he could continue to make adjustments. Thus, by definition, the narrow protection of the VARA does not extend to the many drafts of Scharle's designs created to lay a foundation for the eventual manufacturing of the trophy.

Even assuming that his designs do not constitute drawings within the meaning of the VARA, Scharle argues that this court should consider the trophy itself as a work of visual art in the form of a sculpture, to which he retains the right of attribution. He contends that the fact that Tiffany actually performed the crafting of the trophy is irrelevant because the physical representation is based solely on his conception, drawings, and designs. Although this argument is plausible based on the Copyright Act's definition of works of visual art, it fails when considered in light of the Act's exclusions from that definition. In particular, the Act excludes both "models" and "technical drawings" from the definition of works of visual art. 17 U.S.C. § 101.

Scharle himself characterized his drawings as "the guidelines, the blueprints, the aesthetic design of the product," and he admitted that he never expected his renderings to be displayed as works of art standing alone. Scharle Dep. at 131. He knew that his designs were preliminary, two-dimensional drawings to be used in the process of the eventual creation of a three-dimensional, physical object. Indeed, Scharle created them with extreme exactness precisely so that they could be utilized by the technicians who would be enlisted later in the manufacturing process. *Id.* at 104. He explained as much at his deposition. "[I]f it doesn't work in my 3–D world," he testified, "it's not going to work in our real world." *Id.* Thus, this court concludes that Scharle's drawings are excluded from the definition of works of visual art.

An appropriate Order follows.

### ORDER

**AND NOW**, this 11th day of February, 2005, upon consideration of the Motion of the Franklin Mint for Summary Judgment on its Cross–Claim Against Defendant Matthew T. Scharle (Document 36), and the response thereto, it is **ORDERED** that the said Motion is **GRANTED**. It is **FURTHER ORDERED** that upon consid-

eration of the Motion of Matthew Scharle Under Rule 12(b)(6) of the Federal Rules of Civil Procedure for Dismissal of the Cross–Complaint of the Franklin Mint (Document 47), and the response thereto, the said Motion is **DENIED**.

Upon consideration of the Motion of National Association for Stock Car Auto Racing, Inc. (NASCAR) to Dismiss Defendant Scharle's Counterclaims Against NASCAR (Document 31) and the Motion of Bruce J. Newman to Dismiss or in the Alternative, for Summary Judgment (Document 46), it is **ORDERED** that the said Motions are **GRANTED**. The clerk shall mark this case closed for statistical purposes.